**DAIMLERCHRYSLER AG and Mercedes–Benz USA, Inc., Plaintiffs,**

v.

**FEULING ADVANCED TECHNOLOGIES, INC., and Phillip H. Bank, Trustee of the James J. Feuling Trust, Defendants.**

**No. CIV.00 CV 1541–B (NLS).**

United States District Court, S.D. California.

July 25, 2003.

———————

Richard L. Mayer, Michael J. Lennon, and Mark A. Hannemann, Kenyon & Kenyon, New York City, for declaratory-judgment plaintiffs Mercedes–Benz USA, Inc., et al.

Neil F. Martin, John L. Haller, Susan B. Meyer, Brown, Martin, Haller & McClain, LLP, San Diego, CA, Paul R. Kennerson, John K. Grant, Kennerson and Grant, San Diego, CA, for defendants/counter–claimants James J. Feuling, et al.

**DECISION Re: BIFURCATED TRIAL**

BREWSTER, Senior District Judge.

## I. BACKGROUND

This lawsuit concerns a series of related patents ("the Feuling patents"), issued to James Feuling,[1] that describe a three-valve combustion chamber for use in internal combustion engines: U.S. Patent No. 5,313,921 ("The '921 Patent"), U.S. Patent No. 5,501,191 ("the '191 Patent") and U.S. Patent No. 5,638,787 ("the '787 Patent"). The '921 Patent describes, *inter alia,* a three-valve combustion chamber wherein the two intake valves and one exhaust valve are uniformly spaced around the cylinder centerline. The '191 Patent, a continuation-in-part of the '921 Patent, describes a three-valve combustion chamber wherein the valves are non-uniformly arranged: the intake valves are closer to one another than they are to the exhaust valve. The '787 Patent, also a continuation-in-part of the '921 Patent, does not describe valve

arrangements. Rather, it claims a three-valve combustion chamber in which the exhaust valve to intake valve area ratio is within a range of 45% to 65%. The three patents also describe a variety of single, double, and triple spark plug arrangements.

In August, 2000, Plaintiffs Daimler–Chrysler AG ("Daimler") and Mercedes–Benz USA, Inc. ("Mercedes") filed this action seeking a declaratory judgment that the Feuling patents are unenforceable and/or invalid, and that the Plaintiffs' engines are non-infringing. In February, 2003, the Plaintiffs filed a motion for summary adjudication contending that the '191 and '787 Patents are unenforceable because James Feuling and his agents committed inequitable conduct before the Patent & Trademark Office ("PTO") during the prosecution of the patents. The Court denied the motion on the ground that there were numerous issues of material fact concerning whether Feuling intentionally withheld material information from the PTO. However, because inequitable conduct is an issue for the Court's determination, the Court bifurcated the case and scheduled a bench trial solely on the question whether James Feuling and his agents engaged in inequitable conduct before the PTO during the prosecution of the '191 and '787 Patents.

The bench trial took place on June 17–19, 2003, during which the Plaintiffs made five separate allegations of inequitable conduct on the part of Feuling. Those allegations are as follows:

**A.** James Feuling and his agents intentionally and falsely claimed small entity status in connection with the payment of fees to the PTO for seven years after entering into a $2 million licensing

———————

1. James Feuling died in December, 2002. Before his death, he transferred ownership of the patents to the James J. Feuling Trust.

agreement with Ford Motor Company ("Ford");

**B.** James Feuling and his agents intentionally withheld from the PTO the fact that the subject matter of his patents was at issue in a lawsuit that Feuling filed against the Indian Motorcycle Manufacturing Co. ("Indian"), C.J. Batten ("Batten"), and Batten Corp.;

**C.** James Feuling and his agents intentionally failed to disclose to the PTO information they received during the litigation concerning a three-valve engine manufactured by Batten ("the Batten engine") as early as May, 1994;

**D.** James Feuling and his agents intentionally withheld from the PTO photocopies of a three-valve engine allegedly built by Honda Motorcycle Co. ("Honda") in the late–1980's; and

**E.** James Feuling and his agents intentionally failed to disclose to the PTO that Feuling Advanced Technologies, Inc. had provided Ford a price quote for between 60 and 80 three-valve cylinder heads in 1994.

Subheadings A–E recite the facts surrounding each allegation.

### A. Small Entity Status

On May 19, 1994, in connection with the filing of the '191 Patent application, James Feuling submitted a signed declaration to the PTO declaring:

> I have not assigned, granted, conveyed or licensed and am under no obligation under contract or law to assign, grant, convey, or license, any rights in the invention to any person who could not be classified as an independent inventor....

Pl.'s Ex. 98 ('191 P.H. at DC 000384). Feuling also acknowledged his continuing duty to:

> file, in this application or patent, notification of any change in status resulting in loss of entitlement to small

entity status prior to paying, or at any time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate.

*Id.*

In August, 1995, Feuling completed negotiations to license the Feuling patents to Ford. *See* Pl.'s Ex. 58 at FII 013598 (letter from John Duncan to James Feuling dated August 30, 1995: "By the way, congratulations on the successful conclusion to your negotiations with Ford!"). His patent attorneys, Frank Gilliam and John Duncan, were aware of the negotiations and the impending licensing agreement. *See id.;* Pl.'s Ex. 66; Gilliam Decl. at ¶¶ 4, 5. In September, 1995, John Duncan submitted $110.00 in fees to the PTO for the submission of additional claims relating to the '191 Patent application. The letter accompanying the payment, signed by Duncan, contains a claim of small entity status. *See* Pl.'s Ex. 98, '191 P.H. at DC000428.

On October 25, 1995, the PTO mailed John Duncan a "Notice of Allowance and Issue Fee Due" concerning the '191 Patent. Under the caption entitled, **"HOW TO RESPOND TO THIS NOTICE,"** the document states:

> **I.** Review the SMALL ENTITY Status shown above. If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:
>
> **A.** If the status is changed, pay twice the amount of the FEE DUE shown above and notify the patent and Trademark Office of the change in status; or
>
> **B.** If the Status is the same, pay the FEE DUE [$625.00] shown above.

*Id.* at DC 000433. On November 7, 1995, John Duncan signed the fee certificate and sent a check for $625.00 to the PTO, again claiming small entity status. Less than three weeks later, James Feuling signed the licensing agreement with Ford. *See* Pl.'s Ex. 23 (license agreement between Ford and Feuling Advanced Technologies, Inc., signed by James Feuling on November 27, 1995).

On January 12, 1996, Feuling received a $2 million licensing fee from Ford. *See* Pl.'s Ex. 25. Two weeks later, on January 26th, James Feuling submitted another signed declaration to the PTO claiming small entity status in connection with the application for the '787 Patent. Again, he declared that:

> **I have not assigned, granted, conveyed, or licensed and am under no obligation under contract or law to assign, grant, convey, or license, any rights in the invention to any person who could not be classified as an independent inventor** . . . .

Pl.'s Ex. 26. Once more, he acknowledged his continuing duty to promptly notify the PTO of any change in small entity status.

On August 8, 1996, Feuling paid a terminal disclaimer fee for the '787 Patent application. Under the heading entitled "FEE STATUS," Duncan checked the "Small Entity" box. *See* Pl's Ex. 73. He did it again in December, 1996. See Pl.'s Ex. 74 (terminal disclaimer transmittal signed by John Duncan).

On March 30, 1999, Feuling paid a maintenance fee due on the '191 Patent. The fee payment certificate, signed by Gilliam, contains a claim of small entity status. *See* Pl.'s Ex. 28, '191 P.H. at DC005104. In August, 2000, Feuling paid a maintenance fee due on the '787 Patent. Again, the fee payment certificate, signed by Gilliam, contains a claim of small entity status.

After this litigation ensued, the Plaintiffs obtained Feuling's fee payment documents from the PTO via a Freedom of Information Act request. Thereafter, in November, 2002, James Feuling paid deficiency fees totaling $5,283.00 to the PTO. He admitted that he had "erroneously" claimed small entity status in connection with at least five patents, including the '921, '191, and '787 Patents, over a period of more than seven years. *See* Pl's Ex. 31.

## B. The Batten Litigation

In August 1994, an article, recently published in IronWorks/Iron Trader News, concerning Indian's new "Century V–Twin Chief" engine ("the Batten engine") came to the attention of James Feuling and John Duncan. The article describes a three-valve engine consisting of one or more sparkplugs, two 1½ inch inlet valves, and one 1 5/8 inch exhaust valve. Feuling's patent attorneys believed the new Batten engine might read on Claim 26 of Feuling's '921 Patent. Claim 26 describes two intake valves having "substantially equal areas," one exhaust valve "having an area substantially equal to or slightly greater than the area of one of the intake valves," and one spark plug "located at substantially the center of [the] combustion chamber." Feuling filed a patent infringement suit against Indian and the designers of the engine, C.J. Batten and Batten Corp., in December, 1994. During the prosecution of the '191 and '787 Patents, which are continuation-in-part patents derived from the '921 Patent, Feuling did not disclose the litigation to the PTO.

## C. The Batten Engine

During the course of the litigation, Feuling acquired further information concerning the Batten engine. In January 1995, Indian's president, Wayne Baughman,

stated in a deposition that prototypes of the engine had been produced prior to May 1994. *See* Pl.'s Ex. 12 (Baughman Decl.), p. 142–143. Moreover, in February 1995, Batten's trial counsel gave Feuling and Duncan a drawing of the Batten engine that illustrates a three-valve engine with two intake valves located closer to each other than to the exhaust valve. *See* Pl.'s Ex. 13 at FP 10002; Ex. 2 at Fig. 6.

Feuling filed the application for the '191 Patent in May 1994, and the patent issued on March 26, 1996. Feuling filed the application for the '787 Patent in January 1996, and the patent issued on June 17, 1997. During the prosecution of the '191 and '787 Patents, Feuling did not disclose the information it had received from Indian concerning the Batten engine design and prototypes. Furthermore, in the '191 and '787 Patent specifications, Feuling states that "[t]he prior art arrangements utilize exhaust area/intake area in the range of over 65%." The Batten engine has a valve ratio of 58%.

### D. Photocopies of the Alleged Honda Engine

Among Batten's defenses to Feuling's allegations of infringement was that the '921 Patent was invalid because the invention had been anticipated by prior art. In February 1995, Whelton Whann, one of Batten's attorneys, sent Feuling copies of photographs showing a cylinder head with two intake valves closer to each other than to the exhaust valve and two spark plugs located between the intake and exhaust valves. *See* Pl.'s Ex. 13. at FP 10127. In the accompanying letter, Whann alleges that the photocopies are of a three-valve motorcycle engine manufactured by Honda in the late–1980's. *See id.* at FP 10001.

During the prosecution of the '191 and '787 Patents, Feuling did not disclose to the PTO or investigate the veracity of the information it had received from Batten concerning the alleged Honda engine.

### E. The Price Quotation to Ford

In 1994, Feuling provided a price quotation to Ford for the purchase of 60–80 three-valve cylinder heads for use by Ford in a proposed 6.8L V10 engine. *See* Pl.'s Ex. 22. The cylinder heads consisted of one exhaust valve with a face diameter of 32mm and two intake valves with a face diameter of 34mm (area ratio of 56%). *See id.* at Ex. 19 (drawings of the cylinder). Ford did not purchase the cylinder heads.

During the prosecution of the '787 Patent, Feuling did not disclose to the PTO that it had provided a price quotation to Ford for these three-valve cylinder heads.

## II. STANDARDS OF LAW

### A. Inequitable Conduct

An applicant for a patent has "a duty to prosecute patent applications in the PTO with candor, good faith, and honesty." *Duro–Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1109 (Fed.Cir.2003). *See also* 37 CFR § 1.56 (entitled "Duty to Disclose Information Material to Patentability"). A patent applicant commits inequitable conduct when, "during prosecution of the application, he makes an affirmative representation of material fact, fails to disclose material information, or submits false material information, and does so with intent to deceive." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1358 (Fed.Cir.2003) (citation omitted).

Inequitable conduct is "equitable in nature, and the trial court has the obligation to resolve the underlying facts of materiality and intent." *Duro–Last, Inc.*, 321 F.3d at 1110. Both materiality and intent to deceive must be proven by clear and convincing evidence. *See Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277,

1288 (Fed.Cir.2002). Upon a showing of inequitable conduct during prosecution of the patent, the court "must declare the patent unenforceable because the property right is tainted *ab initio.*" *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1376 (Fed.Cir.2001).

### 1. Materiality

Each individual associated with the filing and prosecution of a patent "has a duty of candor and good faith in dealing with the [PTO], which includes a duty to disclose all information known to that individual to be material to patentability. . . ." 37 C.F.R. § 1.56. As a general rule, information is material if "there is a substantial likelihood that a reasonable [patent] examiner would consider it important in deciding whether to allow the application to issue as a patent." *Brasseler U.S.A. I., L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed.Cir. 2001). In particular, information is material to patentability if:

> [I]t is not cumulative to information already of record [in the application], and
>
>> (1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or
>>
>> (2) It refutes, or is inconsistent with, a position the applicant [has taken] in:
>>
>> (I) Opposing an argument of unpatentability relied on by the [PTO], or
>>
>> (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b).

### 2. Intent

The requirements of materiality and intent can be thought of as inversely proportional. "[A] lesser quantum of intent is necessary when the omission or misrepresentation is highly material, and vice versa." *Amgen, Inc.*, 314 F.3d at 1358.

However, "materiality does not presume intent, which is a separate and essential component of inequitable conduct." *Allen Engineering Corp. v. Bartell Industries, Inc.*, 299 F.3d 1336, 1352 (Fed.Cir.2002) (quotation omitted). There must be some threshold showing of intent, and a court may not find inequitable conduct "on an evidentiary record that is completely devoid of evidence of the patentee's intent to deceive the PTO." *Amgen, Inc.*, 314 F.3d at 1358.

## B. Small Entity Status

Certain inventors, small businesses, and nonprofit organizations may claim small entity status and pay reduced fees to the PTO. *See* 37 C.F.R. § 1.27(a)-(b). A party establishes small entity status through filing a written assertion of entitlement with the PTO, signed by the inventor, his or her assignee, or an attorney or agent registered with the PTO. *See id.* at (c)(2). Prior to filing an assertion of entitlement to small entity status, "[i]t should be determined that all parties holding rights in the invention qualify for small entity status." *Id.* at (f). Therefore, the individual who makes the assertion should be "the person in a position to know the facts about whether or not status as a small entity can be properly established." Manual of Patent Examining Procedure ("MPEP") § 509.03(VI)(2001). This person "has a duty to investigate the circumstances surrounding entitlement to small entity status to the fullest extent." *Id.*

Status as a small entity "must be specifically established by an assertion in each related, continuing, and reissue application in which status is appropriate and desired." 37 C.F.R. § 1.27(c)(4). A new determination and assertion of entitlement is necessary whenever issue and maintenance fees are due. *See id.* at (g). "Improperly, and with intent to deceive, establishing

status as a small entity, or paying fees as a small entity, shall be considered as a fraud practiced upon the [PTO]." *Id.* at (h)(2).

### C. Related Litigation

When the subject matter for which a patent is being sought is, or has been, involved in litigation, "the existence of such litigation and any other material information arising therefrom must be brought to the attention of the [PTO]." MPEP § 2001.06(c)(2001). Such information includes "evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of fraud, inequitable conduct or violation of the duty of disclosure." *Id.*

### III. DISCUSSION

#### A. Small Entity Status.

■ During the bench trial, the Defendants did not dispute the materiality of the misstatements to the PTO concerning Feuling's entitlement to small entity status. Rather, counsel focused on the intent element of inequitable conduct and contended that the assertions of small entity status were made in good faith. The Court finds, however, that there is overwhelming circumstantial evidence suggesting otherwise.

The sheer quantity of the supposed "inadvertent" and "good faith" errors suggests that they were neither inadvertent nor in good faith. James Feuling and/or his agents improperly claimed small entity status and paid reduced fees in connection with the '921, '191, and '787 Patents, not once or twice, but at least *seven times* over a span of more than *seven years*. There are only two possible explanations for such a result: (1) James Feuling's attorneys were grossly negligent and Feuling himself repeatedly signed documents he had not read;[2] or (2) Feuling and his agents intentionally deceived the PTO. The record points squarely to Explanation # 2.

At trial, counsel for the Defendants attempted to portray James Feuling as a man of science who had no time for legalese and blindly relied upon his lawyers to navigate the PTO's procedural maze. However, this portrayal is wholly unsupported by the evidence. The following excerpt from correspondence between John Duncan and James Feuling illustrates the degree to which Feuling was involved in the prosecution of his patents:

> **Dear Jim:**
>
> **I have received another Office Action on the referenced application**
> . . . .
>
> . . . .
>
> **. . . This is the three-valve submarine application. The Examiner is the one who wrote the three-page essay on language in the first Office Action. He still will not accept language such as from about 50% to 60% or from approximately 1:1 to 1:1.2″. He again holds that this is indefinite** . . . .
>
> . . . .
>
> **. . . I think I have found away [sic] around him. I will limit the range, e.g. drop the approximately from the range claims . . . then I will file claims for each end of the range. . . . The final result will be the same as if he had correctly granted the range claims, but will mean that there will be more claims in the case. The reasons for doing this are explained in the draft amendment. . . .**

---

2. This was the essence of John Duncan's testimony at trial. The Court does not find his testimony credible.

**If this approach is acceptable, please let me know.**

Pl.'s Trial Ex. 58.

Duncan discussed claim language with Feuling and sought Feuling's approval for changes in claim strategy. Apparently, James Feuling was no "absent-minded professor" who left the nuts and bolts to his lawyers. He was engaged. Hence, the Court infers that Feuling would not have signed and submitted documents to the PTO without bothering to read them.[3]

A mere two weeks after he received $2 million from Ford in exchange for licensing the Feuling patents, James Feuling submitted a signed declaration to the PTO stating that he had not "assigned, granted, conveyed or licensed ... any rights in the invention to any person who could not be classified as an independent inventor...." Pl.'s Ex. 26. Just as the Court is convinced that Mr. Feuling would not have signed documents without reading them, it is quite certain that the $2 million dollar payment had not simply slipped his mind.

The Court is equally certain that the licensing agreement with Ford had not slipped the minds of Feuling's agents, Gilliam and Duncan. Yet, time after time, the two signed documents claiming small entity status to which Feuling was no longer entitled. This is particularly troubling in light of the fact that John Duncan is a former Patent Examiner. As such, he was acutely aware of the duty to verify Feuling's small entity status before submitting each payment of maintenance fees. *See* MPEP § 509.03(VI)(2001).

The Court finds by clear and convincing evidence that James Feuling and his attorneys, John Duncan and Frank Gilliam, intentionally filed false claims to small entity status with the PTO, thus committing inequitable conduct. Why Feuling and his agents would put the enforceability of patents licensed for millions of dollars at risk to save a few thousand dollars in PTO fees is beyond reason. Yet, the evidence overwhelmingly supports the inference that they did so, and common experience confirms that the world has no shortage of individuals who commit irrational and self-destructive acts.

If this matter of small entity status were the only issue before the Court, it would not impose the penalty of unenforceability since failure to pay appropriate fees does not directly relate to patentability. However, as the following subsections demonstrate, James Feuling and his agents committed other acts of inequitable conduct; the failure to pay proper fees is but one example of a pattern of deceptive conduct further illustrated here below.

### B. The Batten Litigation

#### 1. Materiality

 As previously noted, when the subject matter for which a patent is being sought is, or has been, involved in litigation, "the existence of such litigation and any other material information arising therefrom must be brought to the attention of the [PTO]." MPEP § 2001.06(c)(2001). During the prosecution of the '191 and '787 Patents, Feuling and his agents did not disclose to the PTO that the subject matter of the patent had been the subject of litigation with Indian and Batten.[4] The Defendants argue that

---

3. The common law presumption, of course, is that he did read and understand their contents. See, e.g., *Consolidated Edison Co. v. United States*, 221 F.3d 364, 371 (2d Cir.2000)(stating that, "in general, individuals are charged with knowledge of the contents of the documents they sign....").

4. The '191 and '787 Patents are continuation-in-part patents of the '921 Patent. Thus, if the '921 Patent was involved in litigation, it necessarily follows that the "subject matter" of the '191 and '787 Patents was involved in the litigation.

Feuling's failure to disclose the litigation was not material. This contention flies in the face of the text of MPEP § 2001. Section 2001 refers to "the existence of the litigation *and any other material* information." (emphasis added). Thus, under the MPEP, litigation is material *per se.*

Moreover, in the prosecution of a continuation-in-part patent, the fact that the parent patent was the subject of litigation challenging its validity is clearly information that a "reasonable [patent] examiner would consider [ ] important in deciding whether to allow the application to issue as a patent." *Brasseler U.S.A. I.*, 267 F.3d at 1380. Accordingly, the Court finds that Feuling's failure to disclose the litigation to the PTO during the prosecution of the '191 and '787 Patents was a material omission.

### 2. Intent

The Court finds that James Feuling and his agents committed this material omission with intent to deceive the PTO. This conclusion is based, in part, on the fact that disclosing the existence of the litigation to the PTO would have entailed disclosing highly material information concerning the Batten engine and the alleged Honda engine. *See* MPEP § 2001.06(c)(2001) (articulating the duty to disclose litigation and other material information arising therefrom). *See also infra* Part III(C)(discussing the Batten engine); III(D)(discussing the alleged Honda engine).

The Court finds additional circumstantial evidence that the material omission was made with intent to deceive in the fact that Feuling settled with Batten very shortly after Batten asserted that the '921 Patent was anticipated by prior art. Batten's attorney gave Steele Gillaspey, one of Feuling's attorneys, a drawing of the Batten engine and photocopies of photographs of the alleged Honda engine in February,

1995. *See* Pl.'s Ex. 13 (letter dated February 15, 1995). By May, 1995, the parties were putting the finishing touches on their settlement agreement. *See* Def.'s Ex. CT (letter from Whann to Gillaspey: "I trust that the settlement documents are now in a condition for signature by the respective parties.").

Moreover, the terms of the settlement agreement are highly unusual. Under the heading marked "CONSIDERATION", Batten covenants that "it has not infringed the 921 Patent and will not knowingly infringe the 921 Patent in the future." Def.'s Ex. CW at H002262 (settlement agreement between Feuling and Batten). A promise not to infringe a patent? This "consideration" is no consideration at all because Batten had a preexisting legal duty to refrain from infringing another's patents. As "further consideration" Batten promised: (1) to execute a covenant not to sue; and (2) to publish a press release.

The terms of the covenant not to sue are completely one-sided. Feuling promises never to sue Batten for infringement of the '921 Patent, or even assert that infringement has occurred, with regard to a series of valve arrangements. *See id.* at H002274 (Covenant not to sue between Feuling and Batten). In exchange, Batten promises NOTHING AT ALL. *See id.* As for the press release, it states:

**James J. Feuling has withdrawn his lawsuit alleging infringement of Patent No. 5,313,921 filed by him in December, 1994 in the United States District Court for the Central District of California. Mr. Feuling has agreed with the Defendants named in that lawsuit, Batten Corporation and C.J. Batten, that the Defendants have not infringed U.S. Patent No. 5,313,921.**

*Id.* at H002277. The release is as one-sided as the covenant not to sue. Feuling

admits that Batten has not infringed the '921 Patent, and Batten admits NOTH-ING. Either Feuling and his attorneys were the world's poorest negotiators, or they were anxious to settle a lawsuit that raised significant doubts about the validity of the '921 Patent. After reviewing the evidence, the Court is convinced it was the latter.

Accordingly, the Court finds by clear and convincing evidence that Feuling committed inequitable conduct when he and his agents failed to disclose the Batten litigation to the PTO during prosecution of the '191 and '787 Patents.

### C. The Batten Engine

#### 1. Materiality

■ Feuling maintains that its failure to disclose the Batten engine to the PTO during prosecution of the '191 and '787 Patents was immaterial because the information was cumulative to a prior disclosed reference: U.S. Patent No. 4,742,804 granted to Shigeo Suzuki in 1988 ("the Suzuki patent"). *See, e.g., Regents of University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed.Cir.1997) (holding that a patent applicant has no duty to disclose references that are cumulative to other disclosed references). After carefully reviewing the Suzuki patent, the Court finds that the Batten engine is not cumulative to Suzuki.

The Suzuki patent discloses a number of potential cylinder head, piston, and spark plug arrangements to produce a more efficient engine. Specifically, the patent addresses the use of multi-point ignition using multiple spark plugs arranged at different points in the cylinder head in combination with specific combustion chamber designs. *See* Suzuki patent Col. 2 lines 8–25. The patent only peripherally addresses valve placement and does not address ratios between exhaust and intake valve areas at all, issues discussed

extensively in the Feuling patents and in the article about the Batten engine.

The Suzuki patent discloses two cylinder head designs incorporating two intake valves and a single exhaust valve, similar to all of the cylinder head designs in the Feuling patents. The first design is shown in Figures 16(A) and (B) and described at Column 9 lines 12–24 of the Suzuki patent. This cylinder head has the two intake valves arranged closer to each other than to the exhaust valve, much like the cylinder head of the Batten engine. This, however, is where the similarities between Suzuki and Batten end.

The Suzuki design incorporates multiple spark plugs; the Batten engine uses a single spark plug. Each of the valves in the Suzuki engine are situated at substantially different levels within the cylinder head; the valves in the Batten engine appear to be situated within a single plane. Finally, the Suzuki design has large depressions in the head and piston where combustion takes place; the Batten design has no such depressions. On the whole, the Suzuki and Batten engines are dissimilar in design.

In contrast, the Batten engine bears striking similarity to the engine enabled in the '191 and '787 Patents. Like the '191 and '787 Patents, the Batten design has two intake valves arranged closer to one another than to the exhaust valve. *Compare* '191 Patent, Claims 16–17 and '787 Patent, Claim 1 *with* Pl.'s Ex. 13 at FP 1002 (drawing of Batten engine). Like the '191 and '787 Patents, the Batten design shows each valve arranged at substantially the same level within the cylinder head. *Compare* '191 Patent, Fig. 2 and '787 Patent, Fig. 2 *with* Pl.'s Ex. 13 at FP 1002 (drawing of Batten engine). Claim 23 of the '191 Patent claims an exhaust area/intake area ratio of from 50% to 65%. Claim 12 of the '787 Patent claims

a ratio of 45% to 60%. The Batten engine has a ratio of 58%. Indeed, when one compares the Batten engine to the '191 and '787 Patents, it appears that they are describing the Batten engine.

There is more than a substantial likelihood that a reasonable patent examiner would have considered the Batten engine important in deciding whether to allow the '191 and '787 Patents to issue. Furthermore, the fact that the Batten engine had an area ratio of 58% was in direct contradiction to Feuling's assertion during prosecution of the '191 and '787 Patents that all of the prior art arrangements utilized ratios in excess of 65%. Thus, Feuling's failure to disclose the existence of the Batten engine, and, in particular, the drawings of the Batten engine, to the PTO was a material omission. *See Brasseler U.S.A. I., L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed.Cir.2001); 37 C.F.R. § 1.56(b)(2).

### 2. Intent

■ As previously noted, the requirements of materiality and intent can be thought of as inversely proportional. *See supra* II(A)(2). "A lesser quantum of intent is necessary when the omission or misrepresentation is highly material, and vice versa." *Amgen, Inc.*, 314 F.3d at 1358. Given that the Batten engine bears such great similarity to the '191 and '787 Patents, Feuling's failure to disclose it to the PTO was a material omission of the highest order. This, of course, raises an inference that the omission was committed with intent to deceive.

Nevertheless, the case law makes it clear that intent to deceive cannot be inferred solely from the materiality of the omission. *See id.* at 1358. In the instant case, as in most cases dealing with the issue of inequitable conduct, there is no "smoking gun." Yet, there is sufficient circumstantial evidence, apart from the materiality of the omissions, to meet the requirement of a threshold showing of intent. Again, this evidence comes in the form of the settlement agreement between Batten and Feuling. *See supra* Part III(C)(2) (discussing the settlement agreement).

The timing and terms of the settlement agreement lead to the inescapable conclusion that Feuling and his agents clearly understood that the drawings of the Batten engine and the photocopies of the alleged Honda engine were material to the patentability of all three of the Feuling patents. Thus, the Court concludes that they settled the litigation to avoid the possibility that the '921 Patent might be rendered invalid. Likewise, the Court concludes that during the prosecution of the '191 and '787 Patents, Feuling, and his agents, intentionally withheld the existence of the litigation, the Batten engine drawings, and the alleged Honda engine from the PTO in order to avoid obvious prior art issues.

The Court finds by clear and convincing evidence that Feuling and his agents committed inequitable conduct when they intentionally withheld from the PTO material information concerning the Batten engine.[5]

### D. The Alleged Honda Engine

#### 1. Materiality

■ At the bench trial, the Defendants presented two arguments why the failure

---

5. Whether the Batten engine is, in fact, prior art is immaterial to the issue of inequitable conduct. The drawings of the engine and the deposition testimony indicating that it may have been manufactured as early as May, 1994, were clearly information that a reasonable patent examiner would have considered important in deciding whether to allow the '191 and '787 Patents to issue.

to disclose the photocopies of the alleged Honda engine was not a material omission: (1) the photocopies depict information cumulative to the Suzuki disclosure; and (2) even if the information is not cumulative, it was so unreliable as to be immaterial.

#### a. Cumulativeness

Similar to the '191, '787, and Suzuki patents, the photocopies of the Honda engine depict a cylinder head with two intake valves apparently spaced closer to one another than to the exhaust valve, and a cylinder head with two spark plugs. *See* Pl.'s Ex. 13 at FP10127 (photocopies of alleged Honda engine). However, the Suzuki designs typically show flat cylinder heads with the valves extending below the plane of the cylinder head and into the cylinder. *See* Suzuki patent, Figs. 2–4. To accommodate the valves, the pistons shown frequently contain significant depressions to avoid contact between the piston and the valves. In contrast, the cylinder head shown in the photocopies of the Honda engine appears to be concave, with the valves situated in recesses in the surface of the cylinder head: just like the design disclosed in the '191 Patent. *Compare* Pl.'s Ex. 13 at FP10127 *with* '191 Patent, claim 28.

Like the Batten drawings, the photocopies depict an engine that appears to be very different from the Suzuki patent but intriguingly similar to the '191 and '787 Patents. In any event, the photocopies of the alleged Honda engine clearly are not cumulative to the information disclosed by the Suzuki patent.

#### b. Duty to Disclose

In addition to the unpersuasive contention that the photocopies depict cumulative information, Feuling maintains that they were simply too unreliable to trigger a duty to disclose anything to the PTO. Not so. Whann gave Feuling's attorneys more than mere photocopies. He also told them

the name of the manufacturer, Honda, and the time frame in which the engine was sold, the late 1980's. While a patent applicant and his representatives have no duty to conduct a "fishing expedition" to obtain material information, *see Brasseler*, 267 F.3d at 1383, a duty to investigate arises whenever sufficient information is presented that suggests "the existence of specific information the materiality of which may be ascertained with reasonable inquiry." *Id.* at 1382.

No doubt, Feuling and his agents had sufficient information in their possession to ascertain whether the engine depicted in the photocopies had actually been manufactured and sold. All they had to do was call Honda and ask. Instead, they did nothing. They chose not to "investigate the facts necessary to determine whether the photocopies were material information in an effort to avoid complying with their duty to disclose." *Id.* at 1382. In so doing, the Court finds that Feuling and his agents committed a material breach of the duty to disclose.

#### 2. Intent

For the reasons stated in Part III(C)(2), the Court finds by clear and convincing evidence that Feuling's failure to disclose material information concerning the alleged Honda engine was committed with intent to deceive. Accordingly, the Court finds by clear and convincing evidence that Feuling and his agents committed inequitable conduct.

#### E. Cylinder Heads

The Plaintiffs maintain that the price quote James Feuling's company provided to Ford in 1994 was a commercial offer of sale that triggered the on-sale bar, rendering the subject matter of the '787 Patent unpatentable. *See* 35 U.S.C. § 102(b) (banning patentability of any device on sale more than one year prior to the date of the patent application). Thus,

the Plaintiffs argue, Feuling's failure to disclose this commercial activity to the PTO was a material omission. The Defendants contend that the price quote was strictly for experimental purposes pursuant to a Research and Development Agreement with Ford.

The evidence at trial, particularly the fact that the quotation was for a mere 60–80 cylinder heads for use by Ford in product research and development, not for commercial product sales, supports the Defendants' position. Therefore, the Court finds that the Plaintiffs have not shown by clear and convincing evidence that Feuling's failure to disclose the price quotation to the PTO was an act of inequitable conduct.

## IV. CONCLUSION

A. The Court finds by clear and convincing evidence that James Feuling and his agents committed inequitable conduct when they repeatedly claimed small entity status in connection with fees due on, *inter alia*, the '191 and '787 Patents.

B. The Court finds by clear and convincing evidence that James Feuling and his agents committed inequitable conduct when they failed to disclose the Batten litigation to the PTO during the prosecution of the '191 and '787 Patents.

C. The Court finds by clear and convincing evidence that James Feuling and his agents committed inequitable conduct when they failed to disclose material information concerning the Batten engine to the PTO during the prosecution of the '191 and '787 Patents.

D. The Court finds by clear and convincing evidence that James Feuling and his agents committed inequitable conduct when they intentionally failed to investigate the materiality of the photocopies of the alleged Honda engine and to disclose their findings to the PTO during the prosecution of the '191 and '787 Patents.

Three of the four findings listed above are each, standing alone, a sufficient ground for holding that the '191 and '787 Patents are unenforceable. All four findings, taken together, evince a pattern of deception on the part of James Feuling and his agents in their dealings with the PTO.

For all of the aforementioned reasons, the Court holds that U.S. Patent No. 5,501,191 and U.S. Patent No. 5,638,787 are unenforceable for inequitable conduct. By entering this order the Court has resolved all issues as to the enforceability of the '191 and '787 Patents. Plaintiffs shall prepare a partial judgment against the Defendants on the issue of inequitable conduct relating to the '191 and '787 Patents. All remaining issues will be resolved at trial on November 10, 2003.

IT IS SO ORDERED.